# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| NATHAN J. KOHLHAAS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 08-CV-0239-MJR-PMF** |
| | ) | |
| U.S. UNITED BARGE LINE, LLC, f/k/a | ) | |
| TECO Barge Line, Inc., | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**REAGAN, District Judge:**

This is the second of Nathan Kohlhaas' admiralty suits in this Court arising from injuries allegedly sustained on the MV *Eleanor Gordon* in April of 2005. The first suit was against his former employer, TECO Barge Line, Inc. (TECO), but that case was dismissed without prejudice for failure to prosecute. *Kohlhaas v. TECO Barge Line, Inc.*, No. 06-CV-0102-DRH-PMF (S.D. Ill. Oct. 17, 2006). Kohlhaas sued again in late March of 2008, this time against the employer's successor, U.S. United Barge Line, LLC (United Barge Line).[1] This suit alleges that United Barge Line is responsible for his injuries because his employers negligently caused his injuries and also that unseaworthy conditions onboard the *Eleanor Gordon* proximately caused his injuries. He also alleges that the obligation of the owner of the *Eleanor Gordon* to maintain him and provide cure while recovering from his injury was not satisfied, and that United Barge Line is responsible for this obligation.

---

[1] Kohlhaas also sued and served with summons TECO Energy, Inc., the former sole shareholder of TECO Barge Lines, Inc. According to the first amended complaint, TECO Barge Lines sold all of its assets and obligations to United Barge Line and then dissolved itself, but Kohlhaas sued TECO Energy just in case TECO Barge Lines never assigned its Jones Act obligations to United Barge Line. TECO Energy soon moved to dismiss, noting that the real party in interest was United Barge Line. Kohlhaas later amended his complaint again, dropping TECO Energy from the caption of the case, and the parties stipulated before trial that United Barge Line was Kohlhaas' employer and the owner of the *Eleanor Gordon* for the purposes of the suit. As no mention of TECO Energy was made during trial, it is apparent that Kohlhaas abandoned any claim against TECO Energy.

The Court tried this case without a jury on October 26–29, 2009 and invited the parties to present proposed findings of fact and conclusions of law. To that end, the parties ordered the transcript of the proceedings, prepared on December 14, 2009, and presented their proposed findings and conclusions on January 15, 2010. Having carefully reviewed the voluminous evidence in this admiralty and maritime case in light of the applicable law, the Court finds in favor of Defendant U.S. United Barge Line, LLC, and against Plaintiff Nathan Kohlhaas on all of Kohlhaas' claims. To explain its decision to the parties and to comply with Rule 32 of the Federal Rules of Civil Procedure, the Court issues these findings of fact and conclusions of law, along with its analysis of the legal issues presented by the case.

## Findings of Fact

Background

1.  Plaintiff Nathan Kohlhaas was born July 10, 1983; at the time of his injuries, he was 22 years old; at the time of trial, he was 26 years old. (Final Pretrial Order pt. IV, ¶ 3.)

2.  Kohlhaas graduated from Trigg County High School on May 26, 2002. He attended one year of college at Murray State University in 2002–2003. He did not attend college after his freshman year. (Tr. vol. I at 5.)

3.  Kohlhaas was a member of the Murray State University football team. He practiced with the team but was not eligible to play in interscholastic competition until his sophomore year. While practicing with the team, Kohlhaas injured his right shoulder. More likely than not, this injury was a shoulder dislocation. (Tr. vol. II at 139, 252; vol. III at 223, 263.)

4.  Kohlhaas was an employee of TECO Barge Line, Inc. (now known as Defendant U.S. United Barge Lines, LLC) in April 2005. (Tr. vol. I at 5.)

5.      Kohlhaas worked as an inexperienced deckhand from November 2003 until January 2004 when he was promoted to experienced deckhand. Kohlhaas worked as an experienced deckhand for a year and a half, all aboard the *Eleanor Gordon*, before the incidents in April 2005. (Tr. vol. II at 143–44, 132.)

6.      Kohlhaas received shore-side classroom training, which included review of TECO's operating procedures, safety rules and videotapes showing how to safely do the work of a deckhand. He also had hands on training at TECO's Ohio River facility in Metropolis, Illinois. (Tr. vol. II at 65; vol. I at 191, 194; vol. II at 195.)

7.      Before the incidents, Kohlhaas understood TECO's safety rules and signed a copy, affirming his obligation to comply with the rules. (Tr. vol. II at 198–99; Rebuttal Dep. of Kohlhaas 78.)

8.      TECO Safety Rule 23 requires all crew members to "keep alert" while working. Experts for both sides referred to this as "situational awareness." (Def.'s Ex. 2; Tr. vol. IV at 44.)

9.      Kohlhaas earned $56.79 per day as a deckhand when he started in 2003 with TECO. That rate was increased to $73 per day in 2004, which was the rate he was paid at the time he left the service of TECO in April of 2005. (Final Pretrial Order pt. IV, ¶ 23.) Kohlhaas worked a schedule of 30 days on the boat followed by 30 days off the boat and was paid the same rate during the 30 days off the boat as he was paid while on the boat.

10.     David Willoughby has forty-seven years experience working on the river. He recently retired from TECO after twenty-two years with the company as a licensed master. Willoughby was the master of the *Eleanor Gordon* for seventeen years including trips on which Kohlhaas worked as a deckhand. (Dep. of Captain David Willoughby 5–6.)

11.    David Hopwood was a mate aboard the *Eleanor Gordon* at the time of the incidents. At the time of trial, he was a pilot for TECO. Before becoming a pilot, Hopwood worked as a deckhand and mate for ten years. After completing steersman training and obtaining Coast Guard licensure, he became a pilot for TECO in 2007. Hopwood was Kohlhaas' immediate supervisor at the time of both incidents. Kohlhaas described Hopwood as his best friend on the boat. Hopwood also considered Kohlhaas a friend. (Tr. vol. III at 188; vol. II at 143, 191.)

12.    Charles Lane has been a licensed pilot for thirty-five years, and has twenty years experience working for TECO. Captain Lane was the master of the *Eleanor Gordon* during the events of the suit. (Tr. vol. III at 66–67.)

13.    As master of the *Eleanor Gordon*, Captain Lane was responsible for completing daily vessel logs, which are required to be maintained by the Coast Guard. (Tr. vol. III at 73, 79–80.)

14.    Robert Lee was the chief engineer aboard the *Eleanor Gordon*. (Tr. vol. III at 262.)

15.    John Oglesby, M.D. is a board certified orthopedic surgeon based in Tennessee. He also is a clinical instructor at the University of Tennessee, Chattanooga. (Dep. of John Willis Oglesby 6–8.)

16.    Dr. Treg Brown is an orthopedic surgeon who specializes in shoulder surgery. (Dep. of Dr. Brown 6.)

17.    Dr. Lawrence Kriegshauser is an orthopedic surgeon based in Saint Louis, Missouri. (Dep. of Lawrence Kriegshauser, M.D. 5, 17.)

18.     Dr. Mark Smith is licensed to practice orthopedic medicine in Kentucky. (Dep. of Mark Smith, M.D. 7.)

19.     Captain James Jamison, Kohlhaas' liability expert, has held his commercial master's license and operated commercial vessels on the Inland Waterway System for approximately 50 years. He holds the license Any Gross Tons Masters—the highest available—and has worked on commercial vessels since 1957. He still sails on his commercial master's license. Captain Jamison has worked part-time as a maritime consultant since 1983, a period of 26 years, and has done work for tugboat companies (including TECO in 2003) as an expert and a consultant. (Pl.'s Ex. 54 at 3–6.) While 90% of his consulting work is for injured mariners, he still accepts employment from defense firms. (Tr. vol. I at 126.) Most of his consultations and expert testimony are related to safety and operational issues on inland tug and tow operations.

20.     Captain Samuel Schropp, an expert retained by the defense, holds the following licenses—Master of Steam or Motor Driven Vessels of not more than 1600-gross tons on Inland Waters of the United States and Master of Towing Vessel on the Great Lakes, Western Rivers and Inland Waters of the United States with unlimited radar endorsement. He logs about 1000 hrs. yearly these days and otherwise serves as a marine consultant. The coast guard has certified him a "Designated Examiner." (Tr. vol. IV at 24–30.)

The events surrounding Kohlhaas' injury and treatment

21.     Kohlhaas boarded the *Eleanor Gordon* on April 9, 2005 at 1:00 p.m. Boarding with him was Hopwood. Lane was master of the ship at the time. (Def.'s Ex. 4.)

22.     The *Eleanor Gordon* picked up Barges CM019B and MLR1401 from a fleet near Rosedale on April 12, 2005 at 8:30 a.m. at mile 586 of the Mississippi River. The configuration of the tow is reflected on the vessel log for that day. (Def.'s Ex. 4.)

23.     On the morning of April 14, 2005, the *Eleanor Gordon* dropped Barge TBL11 at mile 126 of the Mississippi River. TBL11 had been positioned on the head of the starboard inboard string. When Barge TBL11 was removed from the tow, Barge 440 was moved over in its place. Barge CM019B was left "uncovered" at the head of the starboard string. (Tr. vol. III at 87; Def.'s Ex. 4.)

24.     Rigging connects barges together in a tow. Rigging consists of thirty-five foot steel wires, chain links, hoops, and ratchets. Loose rigging is created when barges are disconnected from each other. Stationary rigging is rigging that is permanently attached to and remains with the barge. (Tr. vol. I at 147; vol. III at 89.) Ratchets are approximately four feet long, weigh seventy pounds and are used to tighten the wires that couple the barges together. (Tr. vol. I at 83; Pltf's Ex. 64–66.)

25.     Barge TBL11 had stationary rigging when it was dropped on April 14, 2005. When Barge 440 was disconnected from Barge CM019B, any non-stationary rigging would have stayed on Barge 440. (Tr. vol. III at 89.)

26.     Barge CM019B was dropped from the *Eleanor Gordon*'s tow during the afternoon of April 14, 2005, at the Zito fleet, a barge storage operation at mile 106 of the Mississippi River. Kohlhaas was working the back watch (midnight to 6:00 a.m. and noon to 6:00 p.m.) with mate Hopwood. (Def. Ex. 4.)

27.     On April 14, 2005, TECO hired and paid Zito Fleeting, LLC to move barge CM019B using the MV *Big Sam*, a vessel that Zito Fleeting operated, into the Zito fleet from the *Eleanor Gordon*. TECO did not control Zito Fleeting's conduct or the conduct of Zito Fleeting's employees aboard the *Big Sam*. (Pltf.'s Ex. 50; Tr. vol. I at 71–73; vol. III at 114, 168.)

28.     CM019B was a box barge, meaning that instead of having a rake at the front helping it travel through the water it is squared off on both ends. The barge was thirty-five feet wide and 195 feet long. On the head of the barge, there is six to eight feet of working deck between the bow and the cargo box. The cargo box combined with the fiberglass cover rises about six feet above the deck. (Tr. vol. I at 144–45; vol. II at 147.) The vertical portion of the cargo box above the deck is called the coaming.[2]

29.     At approximately 3:00 p.m. on April 14, the *Eleanor Gordon* arrived at the Zito fleet. Hopwood and Kohlhaas proceeded to drop Barge CM019B. Before executing the drop of CM019B, Hopwood and Kohlhaas discussed how they would drop the barge. Hopwood told Kohlhaas to go to the head of the barge and knock the rigging loose so the barge could be dropped and released to the harbor tug. Kohlhaas understood what he was supposed to do. (Def. Ex. 4; Rebuttal Dep. of Kohlhaas 79–83; Tr. vol. I at 170–72.)

30.     Dropping a single barge involves disconnecting the rigging holding the barge to the tow of a towboat, after which another towboat attaches its rigging to the barge and removes it from the tow. Dropping a single barge is a simple, routine operation. It can easily and safely be accomplished by two men in five minutes. It is standard procedure for one man to release the wires from the stern of the barge while the second man goes to the head of the tow to release the head wires. In the unlikely event a third deckhand is on watch during a single barge drop, two men work the stern as there are more wires to release at the stern than the head. (Tr. vol. I at 145–46; vol. III at 92, 192; vol. IV at 40–43; Dep. of Captain David Willoughby 8–10.)

---

[2] In this case, the specific area of the "coaming" that is relevant  is the vertical wall at the head of the barge designed to deflect or prevent water from entering into the cargo area of the barge.

31.     Hopwood did not tell Kohlhaas to hurry, nor did any officer on the *Eleanor Gordon* instruct Kohlhaas to hurry or have a policy of hurrying deckhands when dropping barges. (Tr. vol. III at 204; Dep. of Captain Willoughby 26–27.)

32.     It is not unsafe for a man being alone at the head of the tow to drop a barge as long as the vessel is not underway. (Tr. vol. III at 110–13; Dep. of Captain Willoughby 7–8.) Captain James Jamison, Kohlhaas' liability expert, testified there are multiple circumstances in which it is safe and acceptable for a deckhand to be alone on the head of a tow. To do so is not a violation of TECO or any other river company's safety rules. In fact, Kohlhaas' expert testified TECO did not violate its own safety rules in any respect in the present matter. (Tr. vol. I at 133–34, 175.)

33.     The drop of Barge CM019B took approximately five minutes. (Def. Ex. 4.) This is not an unusual amount of time for such a procedure. A single barge can be safely dropped in five minutes. As far as tow work is concerned, dropping a single barge is as simple as it gets. (Tr. vol. I at 140.)

34.     The Zito fleet where the barge was dropped is calm water and away from other river traffic. There would be no reason for the *Eleanor Gordon*'s crew to be in a hurry while dropping Barge CM019B. (Tr. vol. III at 94.) There was no reason for Kohlhaas to be in a hurry. (Tr. vol. III at 92, 94.)

35.     Hopwood sent Kohlhaas to the head of Barge CM019B to release the wires connecting it to the barge on its port side. Hopwood released the wires on the stern. At this time, the *Eleanor Gordon* and its tow was not underway. As Kohlhaas reached the head of the tow, the *Big Sam* faced up to Barge CM019B. Kohlhaas disconnected the wires connecting the port side of the barges to the tow while a deckhand from the *Big Sam* boarded Barge CM019B and placed

a wire over a fitting on the starboard side.. He attached a wire to that fitting first because it was open (free of other wires) and Kohlhaas was still removing the wire from the port fitting. (Tr. vol. at 152–53.)

36.     Once Kohlhaas disconnected the wire from the port fitting, there was one set of rigging on the head of Barge CM019B. This was not "extra rigging" that could have been removed earlier. It was rigging that had to remain "hard down" until the harbor tug faced up to the barge. (Tr. vol. I at 151–52.)

37.     Even if there was extra rigging on the head of the barge, Kohlhaas could have easily tossed it onto the adjacent barge. It is not a violation of TECO safety policy or rules to store rigging against the coaming of a barge. (Tr. vol. I at 125; vol. III at 110; vol. I at 200–01; Dep. of Captain Willoughby 9; Tr. vol. II at 66–67.)

38.     The TECO Safety Policy Manual prohibits the clearing of rigging from the head of a tow while the vessel and tow are underway. If there was extra rigging as Kohlhaas claims, it could not have been removed safely and in accordance with TECO's safety policy until the *Eleanor Gordon* stopped at Zito fleet. (Tr. vol. I at 161–62.)

39.     Kohlhaas removed securing gear owned by TECO from the deck of the bow of Barge CM019B. Kohlhaas transferred the ratchets by picking them up and then tossing them, using both hands, onto the deck of the adjacent barge. This is a common, well-known and frequently performed procedure, and Kohlhaas had been taught to do this by his supervisors. Tossing a ratchet is a one man job that can be safely performed. (Tr. vol. I at 125–26.)

40.     While tossing the rigging to the adjacent barge, Kohlhaas was facing the harbor tug with his back to the cargo box and was tossing the ratchets from his right side to his left side.

There was nothing blocking Kohlhaas' view as the harbor tug deckhand walked towards the port fitting. (Tr. vol. I at 157; Dep. of Dr. Smith 33–35; Dep. of Dr. Oglesby 9–10.)

41.     The location of the ratchet next to the coaming did not prevent Kohlhaas from facing the harbor tug deckhand because nothing prevented him from moving the ratchet away from the coaming before picking it up. (Tr. vol. II at 96.)

42.     According to Kohlhaas, he was lifting and about to pitch a ratchet, when the fleet tug's deckhand stepped into his way and into his line of sight.[3] To avoid striking the deckhand with the ratchet that was being pitched, Kohlhaas "arrested" his toss by suddenly changing the movement and direction of his arms and shoulders. (Tr. vol. II at 164–66.)

43.     After arresting his toss, Kohlhaas experienced a "popping" sensation in his shoulder. The "popping" sensation was not a dislocation of the shoulder. (Dep. of Dr. Mark Smith 40.)

44.     If the fleet tug had not stepped into Kohlhaas' way, Kohlhaas would not have had to arrest his toss of the ratchet. Additionally, if Kohlhaas had kept alert as required by TECO policies, he would have seen the deckhand and not have initiated the toss when the deckhand was in his line of sight. (Tr. vol. II at 242.)

45.     It was unreasonable for Kohlhaas not to look before he threw the ratchet. (Rebuttal Dep. of Kohlhaas 92; Tr. vol. I at 158; vol. II at 216.)

46.     The credible evidence demonstrates the deckhand of the *Big Sam* did nothing wrong. Captain Lane and Mate Hopwood testified the harbor service deckhand was exactly where he was supposed to be when Kohlhaas threw the ratchet. Even Kohlhaas' liability expert did not understand why Kohlhaas claimed to be surprised the deckhand was in the area when Kohlhaas threw the ratchet. (Tr. vol. III at 208–11; vol. I at 153–57.)

---

[3] This individual has never been identified by either side.

47.     Because Kohlhaas was facing the harbor tug deckhand and opted not to look where he threw the ratchet, a second *Eleanor Gordon* deckhand present at the head of the tow would likely not have prevented Kohlhaas from throwing the ratchet toward the deckhand.

48.     In a statement given by Kohlhaas to TECO on the day he got off the boat, he said he "was throwing ratchet from the high load down to normal load and tug man was pulling off face wire of tug and stepped backwards." This indicates Kohlhaas knew the harbor tug deckhand had to be in the area where Kohlhaas threw the ratchet. The harbor tug deckhand was simply attaching the tug face wire to the barge it was picking up. It is routine for the harbor tug deckhand to be in this area on the barge. Kohlhaas should not have been surprised that the other deckhand was exactly where he was when Kohlhaas threw the ratchet. (Tr. vol. II at 58–59; vol. I at 154–57; Pl.'s Ex. 17.)

49.     Even though Kohlhaas should have known where the deckhand was when he began to toss the ratchet and had an unimpeded line of sight to the deckhand, Kohlhaas lost track of the deckhand for 6–15 seconds and did not know what the deckhand was doing because he failed to look where he was throwing the ratchet before he began the toss. This violates Kohlhaas' responsibility to maintain situational awareness, as TECO safety rule 23 requires. (Tr. vol. I at 131–32; vol. II at 243; Rebuttal Dep. of Kohlhaas 87–90.)

50.     After the shoulder incident, Kohlhaas went to the stern of the barge where Hopwood was working. Kohlhaas told Hopwood he felt and heard a pop in his shoulder. Kohlhaas did not say his shoulder had dislocated, nor did he say he had to manipulate it back into place. Hopwood asked if Kohlhaas was okay, and Kohlhaas responded he was fine. Hopwood asked Kohlhaas if he was okay to continue working. Kohlhaas said he was okay to continue working and he worked the rest of the day without apparent difficulty. Over the course

11

of a few watches, Hopwood asked Kohlhaas a few times if he was doing okay. On one occasion

Kohlhaas said he was fine and on another occasion he said his shoulder was a little sore. It is

common for deck work to create soreness as it is heavy manual labor. (Tr. vol. III at 212–14.)

51.     Shortly after the shoulder incident, but before the hand incident, Hopwood saw

Kohlhaas doing pull-ups on a metal awning on the boat. Kohlhaas did not appear to be in any

pain so Hopwood concluded Kohlhaas' shoulder was fine. Kohlhaas did not ask to fill out an

incident report for the shoulder until a few days later. Kohlhaas worked his regular watches on

April 15 and 16, 2005, without apparent difficulty. (Tr. vol. III at 214–19.)

52.     After dropping Barge CM019B, the *Eleanor Gordon* sailed south through New

Orleans towards Davant, Louisiana. While sailing through the New Orleans harbor, the

deckhands stood "harbor watch" at the head of the tow. This is a common practice designed to

provide the vessel's pilot with two extra sets of eyes in heavy traffic areas. This demonstrates

there are occasions when the deck crew is appropriately asked to stand on the head of the tow

while the vessel is underway. (Tr. vol. III at 95.)

53.     The *Eleanor Gordon* arrived at Davant at 10 pm on April 14, 2005. The vessel's

crew spent the next two hours dropping its entire tow. This is heavy work that requires an extra

hand (the call watchman). Part of the process of dropping the tow is for the deck crew to strip the

heavy rigging from the barges, which would require the crew to carry the rigging on their

shoulders. Kohlhaas would have worked on stripping the rigging from the barges for the last 45

minutes. (Tr. vol. III at 98, 191–92.)

54.     On the morning of April 15, 2005, the *Eleanor Gordon* picked up a tow of 15

empty barges from Davant and sailed north. Kohlhaas placed rigging on the empty barges in

anticipation of doing tow work. This is another occasion after the shoulder incident when

Kohlhaas was able to lift and place the heavy rigging without any apparent difficulty. Hopwood witnessed Kohlhaas doing this work. (Tr. vol. III at 100, 215–16.)

55.    On the afternoon of April 15, the *Eleanor Gordon* picked up 10 loaded barges during Kohlhaas' afternoon watch. This involved a significant amount of tow work and Kohlhaas performed heavy manual labor throughout that watch without apparent difficulty. (Tr. vol. III at 103.)

56.    On April 16, 2005, the *Eleanor Gordon* was picking up barges at Upper St. Rose, Louisiana. Kohlhaas was using a ratchet to tighten a wire between two barges. As is common, Kohlhaas put a "cheater pipe" over the ratchet handle to increase leverage. Kohlhaas then pushed the cheater pipe with both hands. Slack developed in the wire and the cheater pipe lurched forward. There is nothing unusual about slack developing when a wire is being tightened and does not indicate an equipment failure. Kohlhaas' right hand got caught between the pipe and the coaming. (Tr. vol. III at 105.)

57.    The correct method for tightening a ratchet in a tight space is to use an open hand while pushing the cheater pipe towards the coaming. If slack develops in the wire and the ratchet suddenly moves forward, the cheater pipe rather than the seaman's hand will strike the coaming of the barge. Kohlhaas was not utilizing this sensible ratchet tightening method when he injured his hand. (Tr. vol. I at 168–69; vol. III at 106.) Moreover, Kohlhaas was tall enough to place his hand on top of the cheater bar so as to not hit the coaming at all.

58.    If Kohlhaas had utilized the correct method for tightening the ratchet in the tight space, he would not have injured his hand.

59.    Following the hand incident, Kohlhaas and mate Hopwood filled out an incident report on April 16, 2005, documenting the hand and shoulder incidents. Thereafter, Kohlhaas

continued to work his regular watch from April 16 to April 25, without apparent difficulty. (Tr. vol. III at 216–19.)

60.     The injury to Kohlhaas' hand was insignificant and required no treatment to cure it. Kohlhaas noted that his had was "not perfect" but that he "could live with it." (Dep. of Nathan Kohlhaas 34). Kohlhaas sought treatment for the injury to his hand, but the physicians he consulted could not find anything wrong with it. (*Id.* at 165–66.) In fact, the actual curative treatment that he sought focused entirely on the right shoulder. (*Id.* at 34.)

61.     Kohlhaas did additional tow work during the afternoon on April 16. During that watch, 13 loaded barges were picked up and wired into the tow of the *Eleanor Gordon*. Kohlhaas needed both hands to wire the barges into the tow and he did so without apparent difficulty, further demonstrating that the hand injury was insignificant. (Tr. vol. III at 103.)

62.     Before disembarking the vessel on April 25, 2005, Kohlhaas was able to perform all of his normal work responsibilities, including tow work, which is heavy manual labor. (Tr. vol. III at 214–15.)

63.     Between April 16 and April 25, Kohlhaas had numerous opportunities to disembark the *Eleanor Gordon* had he wanted to seek medical attention. Kohlhaas never asked to see a doctor. On April 25, Kohlhaas departed the boat in Metropolis, Illinois, where his car was parked. (Tr. vol. III at 107–08, 221.) He sought medical treatment soon thereafter. (Def. Ex. 4.)

64.     TECO's selected nurse/case manager (Carol Simmons) referred Kohlhaas to J. Wills Ogelsby, M.D., who is located in Nashville, Tennessee, on May 11, 2005. (Pl.'s Ex. 59; Dep. of J. Wills Oglesby, M.D.)

14

65.     Carol Simmons (or her assistant) went with Kohlhaas to his appointment with Dr. Oglesby on May 25, 2005. Ms. Simmons called and wrote to Dr. Ogelsby about that care. (Pl.'s Ex. 59, Dep. of J. Wills Oglesby, M.D.)

66.     The April 25, 2005, Occunet records of Kohlhaas' first treatment after his accident shows Kohlhaas said his shoulder pain was behind his right shoulder blade. (Pl.'s Ex. 25.)

67.     At the exam with Dr. Ogelsby, on May 25, 2005, Dr. Ogelsby concluded that Kohlhaas should be seen by another doctor, and indicated that he did not want to treat Kohlhaas further. (Pl.'s Ex. 59, Dep. of J. Wills Oglesby, M.D. 19.)

68.     Kohlhaas received physical therapy at KORT Physical Therapy Services in Louisville, Kentucky, from June 25, 2005, through July 19, 2005. Pl.'s Ex. 24 at 135.

69.     Kohlhaas then sought medical care from Dr. Smith on September 16, 2005. (Pl.'s Ex. 55, Dep. of Mark Smith, M.D. 3.)

70.     Dr. Smith examined and treated Kohlhaas, conducted various tests, and initially diagnosed Kohlhaas with a possible anterior labral tear or rotator cuff tendonitis. (Pl.'s Ex. 55, Dep. of Mark Smith, M.D. 4.)

71.     Dr. Smith performed arthoscopic surgery on Kohlhaas' right shoulder on October 25, 2005, to address: (1) repair of a Bankart tear of the right shoulder; (2) a separation of the anterior labral; and (3) a Hill–Sachs defect of the humeral head. (Pl.'s Ex. 55, Dep. of Mark Smith, M.D. 5.)

72.     A Hill–Sachs lesion is evidence of a shoulder dislocation. Dr. Smith testified that if Kohlhaas had dislocated his shoulder during the shoulder incident, he would not be able to continue working that day or the subsequent days. (Dep. of Dr. Mark Smith 38–46.)

73.     Dr. Smith could not state with a reasonable degree of medical certainty that Kohlhaas suffered a dislocated shoulder during the shoulder incident. (Dep. of Dr. Mark Smith. 40.)

74.     Kohlhaas received physical therapy from November 22, 2005, until March 16, 2006.

75.     Dr. Smith last saw Kohlhaas on February 17, 2006. At that time, Dr. Smith's plan was to release Kohlhaas to return to work without restriction on March 6, 2006. Kohlhaas was to have returned to see Dr. Smith on that date, but failed to do so. Kohlhaas never contacted Dr. Smith's office thereafter. (Dep. of Dr. Mark Smith 19, 43.)

76.     Instead of returning to see Dr. Smith for his final appointment, Kohlhaas went to see Dr. Lawrence Kriegshauser who examined Kohlhaas at the request of the Lakin Law Firm, which represented Kohlhaas at the time. Dr. Kriegshauser examined Kohlhaas on March 30, 2006, approximately three weeks after Kohlhaas was to have returned to Dr. Smith to be released. Kohlhaas told Dr. Kriegshauser he had a history of "popping and snapping" over his right shoulder blade, which pre-dated the shoulder incident. On April 25, 2005, Kohlhaas went to Occunet to have his hand and shoulder examined. He reported his shoulder pain was on the right behind the shoulder blade. (Dep. of Dr. Kriegshauser 7–8; Tr. vol. II at 74; Pl.'s Ex. 25.)

77.     Dr. Kriegshauser performed a physical examination and obtained an MRI, the results of which he reviewed with Kohlhaas on May 25, 2006. The MRI showed there was no evidence of a new or recurrent tear of the shoulder. The surgical repair was holding well and Kohlhaas had excellent strength and normal motion. (Dep. of Dr. Kriegshauser 13–14.)

78.     Dr. Kriegshauser did not recommend further surgery or treatment for Kohlhaas. He advised Kohlhaas there was no medical reason to keep him off work or to restrict his

activities. Dr. Kriegshauser released Kohlhaas on May 25, 2006. (Dep. of Dr. Kriegshauser 15–17.)

79.     Kohlhaas has not returned to deckhand work or similar maritime work on the river, nor has he returned full-time to any construction or related work. With the exception of attempts at part-time carpentry or construction-related work, which was not successful, Kohlhaas has not returned to any meaningful or full-time employment since leaving TECO's employ in April 2005. He did some part-time work, including bartending and some carpentry and construction related work, but it was not steady or full time work, and it did not last.

80.     Dr. Brown first examined Kohlhaas on December 3, 2008, a year and a half after Kohlhaas was released by Dr. Kriegshauser. (Dep. of Dr. Brown 6–7.)

81.     Kohlhaas reported a mere popping sensation during the shoulder incident. Kohlhaas did not report having to reduce his shoulder. (Dep. of Dr. Brown 71.)

82.     Dr. Brown noted Kohlhaas had good rotator cuff strength. He noted it was difficult to determine if Kohlhaas was giving full effort during the physical examination. (Dep. of Dr. Brown 12.)

83.     Dr. Brown ordered another MRI, which he reviewed with Kohlhaas on January 14, 2009. (Dep. of Dr. Brown 14–15.)

84.     Dr. Brown discussed various treatment alternatives, including arthroscopic surgery, but Kohlhaas indicated he did not want surgery as of January 14, 2009. (Dep. of Dr. Brown 15.)

85.     Dr. Brown completed a "report of work status and restrictions" in which he returned Kohlhaas to work with mild restrictions effective February 4, 2009. (Dep. of Dr. Brown 16.)

86.     Kohlhaas then returned to see Dr. Brown and advised he had changed his mind and wanted to proceed with surgery. (Dep. of Dr. Brown 18.)

87.     Dr. Brown counseled Kohlhaas that with his relatively normal appearing MRI and physical exam, he would potentially be undergoing surgery for no reason. (Dep. of Dr. Brown 18–19.)

88.     During the procedure, Dr. Brown removed scar tissue but did not find anything else to support Kohlhaas' complaints of pain. This was discussed with Kohlhaas following the procedure. (Dep. of Dr. Brown 19–20.)

89.     Dr. Brown last saw Kohlhaas on September 22, 2009, at which time he released Kohlhaas and placed him at maximum medical improvement (MMI).

90.     Dr. Brown testified Kohlhaas did not describe a dislocation of the shoulder during the shoulder incident. However, Dr. Brown saw evidence of the Hill–Sachs lesion, which means Kohlhaas had dislocated his shoulder sometime in the past. (Dep. of Dr. Brown 30–32.)

91.     Dr. Brown testified that a dislocated shoulder is much more serious than the "popping" sensation Kohlhaas reported at the time of the incident. A first shoulder dislocation usually requires some type of maneuver to reduce the shoulder. There is no testimony, nor medical records demonstrating that Kohlhaas had a reduction of a dislocated shoulder after the shoulder incident. (Dep. of Dr. Brown 70–71.)

92.     TECO paid maintenance to Kohlhaas at a rate of $30.00 per day for April 25, 2005 through July 2, 2006. The first maintenance payment was not made until June 1, 2005, with the final payment made on August 18, 2006. No further maintenance payments occurred after August 18, 2006. TECO paid total maintenance of $12,999. (Final Pretrial Order pt. IV, ¶ 24.)

93.     Kohlhaas received short term disability benefits totaling $7,710. Those benefits were paid under a policy paid for in full by TECO and the benefits were not the product of a collective bargaining agreement. (Tr. vol. IV at 2–7; Def.'s Ex. 8.)

94.     A summary of the medical expenses incurred through the date of the trial is as follows:

| Provider | Dates of Service | Total Charges |
|---|---|---|
| Occunet | 4/25/05 thru 4/26/05 | $161.35 |
| Crawford & Lundberg X-ray Clinic | 11/14/03 and 4/25/05 | $287.00 |
| Western Baptist Hospital | 4/25/05 | $1,761.66 |
| Premier Radiology | 5/11/05 | $4,171.50 |
| High Field & Open MRI | 7/18/05 and 4/12/06 | $5,000.00 |
| Lawrence Kriegshauser, M.D. Premier Care Orthopedics | 3/30/06 thru 6/8/06 | $871.00 |
| J.Wills Oglesby, M.D. Tennessee Orthopedic Alliance | 5/11/05 thru 5/25/05 | $584.00 |
| Norton Hospital | 10/25/05 | $14,795.25 |
| Cyna Khalily, M.D. Louisville Bone & Joint Clinic | 6/2/05 thru 7/26/05 | $421.00 |
| KORT Physical Therapy | 6/8/05 thru 7/18/05 | $1,281.00 |
| Mark Smith, M.D. Ellis & Badenhauser Orthopedics | 9/16/05 thru 2/17/06 | $7,469.76 |
| Treg Brown, M.D. Southern Orthopedic Associates | 12/3/08 thru9/22/09 | $3,168.00 |
| Orthopedics Plus | 2/16/09 thru 7/10/09 | $3,726.00 |
| Save on Drugs | 5/18/09 | $79.53 |
| Radiology Group of Paducah | 4/25/05 | $357.00 |
| Southern Illinois Orthopedic Center | 5/9/09 | $7,375.41 |
| Brigham Anesthesia South | 5/18/09 | $950.00 |
| Enterprise Medical | 5/18/09f | $15.00 |
| Memorial Hospital of Carbondale | 12/10/08 | $3,078.48 |
| Cape Radiology Group | 12/10/08 | $517.00 |
| Hampton Physical Therapy | 8/19/09 | $780.00 |
| Walgreens | Various | $357.77 |
| Anesthesia Associates of Louisville | 10/25/05 | $1848.00 |
| Peter Rothschild, M.D., Open MRI | 4/12/06 | $2,500.00 |
| | **TOTAL:** | **$61,555.71** |

(Pl.'s Ex. 26.)

95.     Up to the end of Kohlhaas' treatment with Dr. Smith on February 17, 2006, Kohlhaas had incurred reasonably necessary medical bills of $35,995.25. TECO's payments covered $20,249.63 of these expenses. The remainder was covered through adjustments by the providers in the amount of $15,745.62. (Final Pretrial Order pt. IV, ¶ 25; Pl.'s Ex. 26.)

96.     TECO overpaid one provider, Western Baptist Hospital, by $181.62. TECO also paid $933.38 to Peter Rothschild, M.D., for treatment incurred on April 12, 2006 by Kohlhaas after he finished treatment with Dr. Smith. These two payments, coupled with TECO's payments covering Kohlhaas' treatment up to Dr. Smith's involvement, bring TECO's total medical payments to $21,364.67. (Pl.'s Ex. 26.)

Credibility of the witnesses

97.     The factual findings above conform with the stipulations entered by the parties and where controverted, with evidence presented of witnesses which the Court finds credible. Exceptions include the testimony of Travis Taylor and Nathan Kohlhaas, neither of whom the Court finds credible.

98.     Travis Taylor was a deckhand on the *Eleanor Gordon* serving on the crew at the time of Kohlhaas' alleged injuries. Kohlhaas' offered Taylor's deposition in support of his version of the facts of the story. However, Taylor's account lacks credibility due to lack of first-hand knowledge. Taylor served as the call watchman, who does not stand a regular six hour watch but is only summoned when there is significant tow work to be done. The call watchman would not participate in dropping a single barge. Because Captain Lane knew that Taylor would be needed to assist in dropping the *Eleanor Gordon*'s entire tow at Davant, Taylor would have been allowed to rest earlier in the day. Taylor would not have been on watch at the time of the shoulder incident. Hopwood testified Taylor was not on watch at the time of the shoulder incident. Further, Taylor's testimony that the shoulder incident occurred near Metropolis,

Illinois, demonstrates his memory of the shoulder incident is incorrect. The Court gives no weight to Taylor's testimony regarding the shoulder incident. (Tr. vol. III at 98–99, 191–92; Dep. of Travis Taylor 15.)

99.     As to Nathan Kohlhaas' own testimony, he gave varying and inconsistent accounts of the two incidents and his injuries that were at odds with his own in-court testimony, his prior deposition testimony, and his statements to medical providers and to his employer. Other witnesses in his case were credible, such as Hopwood whom Kohlhaas described as his best friend on the boat. While it is not uncommon for truthful witnesses to have some variation in their own stories, the breadth of Kohlhaas' inconsistencies establishes his lack of credibility on the fundamental aspects of his case. The Court does not believe his version of the facts as to the shoulder incident and his version of the hand incident is incomplete because he lied about an injury to it just 3 weeks before the injury alleged in the instant case. Kohlhaas' claims are suspect and fail because of credibility infirmity on liability, causation and damages.

100.     Kohlhaas testified that extra rigging necessitated him to perform unnecessary work that exposed him to danger. Hopwood, however, was absolutely sure there was no extra rigging on the head of Barge CM019B and that any loose rigging created when Barge 440 was disconnected from Barge CM019B would have remained with Barge 440. Kohlhaas claims Hopwood's testimony is untruthful. (Tr. vol. III at 194, 235; Rebuttal Dep. of Kohlhaas 72–73.) The credible evidence establishes there was no "extra rigging" on the head of Barge CM019B, but rather one set of rigging created when barge CM019B was disconnected from the tow. (Tr. vol.III at 85, 89.) As such, Kohlhaas' theory is unpersuasive.

101.     Kohlhaas worked for TECO as an experienced deckhand for a year and a half before the shoulder incident. The experts for both sides testified Kohlhaas had sufficient

experience to know how to drop a single barge. Kohlhaas believed he had sufficient experience to be a mate and claims Hopwood told him he would be promoted to mate within a few months. (Tr. vol. IV at 48; vol. I at 135–36; Rebuttal Dep. of Kohlhaas 74.)

102.    Hopwood testified Kohlhaas had gone alone to the head of the tow to drop barges many times before the shoulder incident. Captain Lane and Captain Willoughby testified that a deckhand with Kohlhaas' experience would have previously done this job alone. (Tr. vol. III at 203; vol. III at110; Dep. of Captain Willoughby 12–13.)

103.    Captain Lane testified there is nothing unsafe about a man being alone at the head of the tow to drop a single barge. Kohlhaas testified in his rebuttal deposition that although that may have been acceptable to Captain Lane, Kohlhaas was more accustomed to working with Captain Willoughby who had a strict prohibition against deckhands going alone to the head of the tow under any circumstance. Although Kohlhaas was eager to testify about Captain Willoughby's "rule," he objected when TECO sought leave to depose Captain Willoughby. In his sur-rebuttal deposition, Captain Willoughby flatly denied having a rule which prohibited deckhands from going alone to the head of the tow to drop a barge. Captain Willoughby testified it is safe for a deckhand to go alone to the head of the tow to do such work as long as the vessel is not underway. (Tr. vol. III at 110–113; Rebuttal Dep. of Kohlhaas 61–63; Dep. of Captain Willoughby 7–8.)

104.    In a statement given by Kohlhaas to TECO on the day he got off the boat, he said he "was throwing ratchet from the high load down to normal load and tug man was pulling off face wire of tug and stepped backwards." This indicates Kohlhaas knew the harbor tug deckhand had to be in the area where Kohlhaas threw the ratchet. The harbor tug deckhand was simply attaching the tug face wire to the barge it was picking up. It is routine for the harbor tug

deckhand to be in this area on the barge. Kohlhaas' own expert testified Kohlhaas should not have been surprised the other deckhand was exactly where he was when Kohlhaas threw the ratchet. (Tr. vol. II at 58–59; vol. I at 154–57; Pl.'s Ex. 17.)

105.    There was nothing blocking Kohlhaas' view as the harbor tug deckhand walked towards the port fitting. However, Kohlhaas testified he was throwing the rigging from his left to his right. If true, he was facing towards the stern of the barge and had his back to the harbor tug and the movements of the harbor tug deckhand. Kohlhaas suggests this explains his failure to see the other deckhand enter the area as he threw the ratchet. However, Kohlhaas told Dr. Smith and Dr. Oglesby that he was injured throwing rigging from his right to left. The Court finds the credible evidence demonstrates Kohlhaas threw the ratchet from his right to left and that he was facing the harbor tug deckhand when he threw the ratchet. (Tr. vol. I at 157; Dep. of Dr. Smith 33–35; Dep. of Dr. Oglesby 9–10.) This conclusion is supported by the second amended complaint: "As a result plaintiff was forced to arrest his motion, in order to prevent the ratchet from colliding from the person *in front of him*." (2d Am. Compl. ¶ 5 (emphasis added).)

106.    At trial, Kohlhaas testified he lost track of the other deckhand for approximately six seconds before he threw the rat*chet. During his* deposition, Kohlhaas testified he had not seen the other deckhand for fifteen seconds when he threw the ratchet.(Tr. vol. I at 131–32; vol. II at 243; Rebuttal Dep. of Kohlhaas 87–90.)

107.    Kohlhaas testified that he was hurried. Mate Hopwood denied telling Kohlhaas to hurry. Captains Lane and Willoughby testified they have never hurried deck crew while dropping a barge. The credible evidence demonstrates Kohlhaas was not hurried at the time of the shoulder incident. (Tr. vol. III at 204; Dep. of Captain Willoughby 26–27.)

108.    Kohlhaas testified the harbor service deckhand had connected the face wire on the port side, walked off the barge and then unexpectedly returned to the area when Kohlhaas threw the ratchet. However, the day he disembarked the *Eleanor Gordon*, Kohlhaas told a representative of TECO that the harbor service deckhand was pulling on the face wire at the time of the shoulder incident. These are two separate, distinct and unrelated activities.

109.    Hopwood, Captain Lane and Captain Willoughby all testified Kohlhaas had went alone to the head of the tow before. Kohlhaas says that the testimony of all three witnesses is untruthful. (Tr. vol. III at 203; vol. III at 110; Dep. of Captain Willoughby 12–13; Rebuttal Dep. of Kohlhaas 75–76.)

110.    Dr. Oglesby and Dr. Smith noted in their records and testified Kohlhaas reported he injured his shoulder while tossing rigging to his left. Kohlhaas testified the doctors' records and testimony are incorrect, and that he in fact threw the ratchet to his right. (Dep. of Dr. Oglesby 9–10; Dep. of Dr. Mark Smith 34, l. 1-18; Rebuttal Dep. of Kohlhaas 93–94.)

111.    Captain Lane testified he had to counsel Kohlhaas about racist comments and behavior towards an African-American deckhand. Kohlhaas denied racist comments and behavior, or that Captain Lane counseled him about such matters. (Tr. vol. III at 184–86; Rebuttal Dep. of Kohlhaas 94–95.) While this impeachment may have marginal relevance on the issue of Kohlhaas' ability to get along with and supervise diverse individuals, the Court disregards it as impeachment on a collateral issue since it does not believe Kohlhaas was likely to be promoted to the position of pilot or other supervisory position.

112.    Mate Hopwood testified he saw Kohlhaas doing pull ups on the boat shortly after the shoulder incident. Kohlhaas denies doing pull ups after the shoulder incident. (Tr. vol. III at 217; Rebuttal Dep. of Kohlhaas 95.)

113.    Chief Engineer Robert Lee testified Kohlhaas told him he injured his right shoulder playing college football. Kohlhaas admits playing football in high school and college, but denies injuring his shoulder playing football or saying that to anyone. (Tr. vol. III at 262; Rebuttal Dep. of Kohlhaas 95–96.)

114.    Dr. Kriegshauser testified, and his records reflect, that Kohlhaas reported a history of popping and discomfort in his right shoulder blade long before the shoulder incident on the barge. Kohlhaas denies making those statements to Dr. Kriegshauser and testified that Dr. Kriegshauser's records and testimony are incorrect. (Dep. of Dr. Kriegshauser 7–8; Rebuttal Dep. of Kohlhaas 96.)

115.    Kohlhaas treated with three orthopedic surgeons of his own choosing, including Dr. Smith, Dr. Kriegshauser and Dr. Brown. Drs. Smith, Kriegshauser, and Brown each gave Kohlhaas a full return to work without restriction. All three doctors testified they communicated the return to work to Kohlhaas. Kohlhaas denies that Dr. Smith and Dr. Brown told him he could return to work. (Dep. of Dr. Smith 43; Dep. of Dr. Kriegshauser 15–17; Dep. of Dr. Brown 16; Rebuttal Dep. of Kohlhaas 99–100.)

116.    Kohlhaas was dismissed from a physical therapy program after the shoulder incident because of repeated absences. (Dep. of Hilbert Potter 16–18; Tr. vol. II at 158.)

117.    During his deposition, Kohlhaas denied suffering any subsequent injuries to his right hand. In fact, just three weeks before his deposition, Kohlhaas had gone to the emergency room after striking his right hand on a metal object. (Dep. of Dr. Shea Godwin 5–10; Tr. vol. II at 271–72.)

118.    Kohlhaas completed a job application for American Commercial Lines, LLC (ACL) in September 2004, in which he stated he worked as a bartender and "bouncer" after the

shoulder incident. At the end of the application, Kohlhaas attested the information he provided was accurate. Kohlhaas testified he did not work as a bouncer and exaggerated about being a bouncer on the application in order to improve his chances of getting a job. In his rebuttal testimony, Kohlhaas admitted he lied on the ACL application. (Def.'s Ex. 24; Tr. vol. II at 180–81; Rebuttal Dep. of Kohlhaas 101.)

119.   On the ACL application, Kohlhaas indicated he earned as much as $17 an hour working as a bartender/bouncer. Kohlhaas testified it was not $17 an hour, but rather $12 per hour, and Kohlhaas testified, incredibly, that the "7" on the form was a "2." (Def.'s Ex. 24; Tr. vol. II at 181.)

120.   Kohlhaas testified he hurt his shoulder throwing a ratchet to his right. Dr. Smith testified and his records reflect that Kohlhaas reported he injured his shoulder while throwing a line (rope) to his left. (Dep. of Dr. Mark Smith 34.)

121.   Kohlhaas' own liability expert admits the percentage of deckhands who eventually become pilots is fairly small. Kohlhaas has convictions for DUI and possession of marijuana, which would be considered adversely by the Coast Guard if he were to seek a pilots' license. (Tr. vol. I at 172–80; Def. Ex. 20.) The Court finds that it would be speculative to believe Kohlhaas would attain the status of pilot.

## **Conclusions of Law**

Conclusion 1: The Court exercises subject-matter jurisdiction in this case through its jurisdiction over admiralty and maritime cases.

The Court could exercise subject-matter jurisdiction over this case in two ways. One way would be on the "law side" of the federal courts through the Court's jurisdiction over causes of action arising under federal statutes. 28 U.S.C. § 1331 (2006). That works for plaintiff's Jones Act claim, but not for his general maritime law claims because the federal question statute does

not include the general maritime law. *Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 378 (1959). The only way to get those into the "law side" when asserting general maritime law along with the Jones Act would be through the presence of diversity jurisdiction or supplemental jurisdiction. 28 U.S.C. § 1367; *Atl. & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 360 n.2 (1962). If Kohlhaas had proceeded this way, either he or the defendants would have had the right to trial by jury. *Fitzgerald v. United Lines Co.*, 374 U.S. 16, 21 (1963). As all of Kohlhaas' claims are also within the Court's admiralty jurisdiction, the second way would be on the "admiralty side" of the Court, but he needed to specify that his suit is an admiralty suit for admiralty jurisdiction to attach. *Wingerter v. Chester Quarry Co.*, 185 F.3d 657, 666 n.5 (7th Cir. 1999). Kohlhaas specifically elected to proceed as an admiralty and maritime suit under Rule 9(h) in both his initial and amended complaints, and the Court will not disturb his election.

Conclusion 2: TECO did not negligently cause the injury to Kohlhaas' right shoulder.

The Jones Act creates a federal negligence claim for seamen for injuries incurred due to the negligence of their employer. 46 U.S.C. § 30104 (2006); *Howard v. S. Ill. Riverboat Casino Cruises, Inc.*, 364 F.3d 854, 856 (7th Cir. 2004). Congress enacted the Jones Act to provide seaman with heightened legal protection, due to their exposure to the "perils of the sea." *Howard*, 364 F.3d at 856 (quoting *Chandris, Inc. v. Latsis*, 515 U.S. 347, 368 (1995)); *see also Kelley v. Sun Transp. Co.*, 900 F.2d 1027, 1031 (7th Cir. 1990).

Although the term "seaman" is not defined in the statute itself, the federal courts have interpreted the term. *Howard*, 364 F.3d at 856 (quoting *Chandris, Inc.*, 515 U.S. at 373) (citing *McDermott Int'l v. Wilander*, 498 U.S. 337, 354–55 (1991)). Regardless of the interpretation, the parties here have stipulated that Kohlhaas was a seaman for the purpose of the Jones Act. (Final Pretrial Order pt. IV, ¶ 3.)

With respect to the shoulder incident, Kohlhaas asserts six theories of how TECO negligently caused his injury: (1) TECO failed to conduct a pre-task conference; (2) TECO sent Kohlhaas to the head of the tow by himself in violation of the "buddy system"; (3) TECO sent Kohlhaas to the head of the tow to drop a single barge when he had never performed that operation alone before; (4) TECO failed to remove extra rigging on the head of the tow which Kohlhaas was then forced to remove without assistance; (5) TECO rushed Kohlhaas and (6) the deckhand of the *Big Sam* was TECO's employee and was in the wrong place at the wrong time.

Under the Jones Act, the seaman's burden to prove causation is very light and has been described as "featherweight." *Cella v. United States*, 998 F.2d 418, 427–28 (7th Cir. 1993). "The plaintiff must merely establish that the employer's acts or omissions played some part, no matter how small, in producing the employee's injury." *Id.* at 428 (citing *Bristler v. A.W.I., Inc.*, 946 F.2d 350, 354 (5th Cir. 1991); *Chisholm v. Sabine Towing & Transp. Co.*, 679 F.2d 60, 62 (5th Cir. 1982); *Joyce v. Atl. Richfield Co.*, 651 F.2d 676, 685 (10th Cir. 1981)). This standard of causation is referred as the "producing cause" standard. *Id.* So, to determine if TECO was responsible for Kohlhaas' injury, the Court must make two determinations: (1) did any of the six alleged acts of TECO play some part in producing the injuries for which Kohlhaas seeks damages and (2) were those acts negligent. For Kohlhaas, his six theories all fail on causation because the Court finds, more likely than not, none of the events he alleges in fact occured, so they could not have played a part in producing the injury that Kohlhaas seeks recovery. In the unlikely event they did occur as Kohlhaas claims, TECO's acts were not negligent.

First, although not required, some sort of pre-task conference occurred before the shoulder incident. Hopwood told Kohlhaas to go to the head of the tow and release the head wires so that Barge CM019B could be dropped and removed from the tow by the harbor tug.

Kohlhaas understood Hopwood's instructions and knew what he was to do. The Court cannot say that the lack of a formal conference played some role in producing Kohlhaas' injury. The pre-task conference that did occur, while brief, was adequate. As mentioned before, Kohlhaas understood Hopwood's instructions, and Hopwood mentioned the presence of the harbor tug, which should have been enough information for an experienced deckhand like Kohlhaas. The Court finds that while TECO did not conduct a formal pre-task conference the communication that did occur was not inadequate due to lack of formality or brevity.

Second, Kohlhaas had dropped a single barge at the head of the tow before. Captain Lane, Captain Willoughby and mate Hopwood all testified Kohlhaas had experience going alone to the head of the tow to drop a barge. Kohlhaas' liability expert testified he would expect a deckhand with Kohlhaas' experience to know how to do this task. Kohlhaas' claim that he was in line for a promotion to mate based on his experience as a deckhand is inconsistent with his claim that he had never done this task before the shoulder incident. The Court finds the credible evidence demonstrates Kohlhaas had previously gone alone to the head of a tow to drop a single barge and that it was a common, reasonable practice to send someone with Kohlhaas' experience to the head of the tow to drop a single barge.

Third, the rigging on the head of the tow at the time of the drop of CM019B was not extra rigging. Captain Lane and mate Hopwood testified there would not have been any "extra rigging" on the head of Barge CM019B that Kohlhaas would have been required to move at the Zito fleet. Their testimony along with the vessel logs establish that any extra rigging created when Barge CM019B was disconnected from Barge 440 would have stayed with Barge 440. One set of portable rigging was created when Kohlhaas disconnected Barge CM019B from the tow. However, this was not extra rigging, but rather hard down rigging that had to stay in place until

the harbor tug faced up to the barge. The Court finds there was no extra rigging on the head of Barge CM019B. Even if there was extra rigging as Kohlhaas claims, the Court finds he could have easily removed it without assistance. Tossing ratchets and transferring rigging is commonplace and a one man job.

Fourth, TECO did not rush Kohlhaas. The officers of the *Eleanor Gordon* did not instruct Kohlhaas to hurry at the drop of CM019B at the Zito fleet. Kohlhaas had no reason to hurry. It took approximately five minutes to drop Barge CM019B. That is a sufficient amount of time to complete that task safely in the still water around the Zito fleet. Kohlhaas' own expert testified that dropping a single barge is simple tow work. Captain Lane and mate Hopwood denied telling Kohlhaas to hurry. The credible evidence establishes that Kohlhaas was not hurried during the drop of Barge CM019B.

Of the remaining two theories, the Court finds that, more likely than not, a second person at the head of the tow with Kohlhaas would not have helped him. Despite facing the direction of the *Big Sam* right where the fleet deckhand was and was supposed to be, Kohlhaas threw a ratchet right at him. A "buddy" being there at the same time would probably not have supposed that Kohlhaas was not looking where Kohlhaas was throwing given the fact that Kohlhaas was facing in the direction of the *Big Sam*. By the time the "buddy system" would have done anything given Kohlhaas' own negligence in this circumstance, it would only have lead to Kohlhaas having to arrest his throw again once he heard the "look out!" from his buddy. Indeed the presence of another person at that time and place may have increased the likelihood of an incident by doubling the number of potential targets since Kohlhaas threw the ratchet without looking. Thus, the lack of reliance on the "buddy system" did not produce Kohlhaas' injury. In making this assessment, the Court bears in mind that a Jones Act seaman must act with ordinary

prudence under the circumstances of his employment. *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 339 (5th Cir. 1997); *accord Jackson v. OMI Corp.*, 245 F.3d 525, 528 (5th Cir. 2001). The "circumstances" of a Jones Act seaman's employment include not only his reliance on his employer to provide a safe workplace but also the seaman's own experience, training, or education. Thus, the reasonable person standard in a Jones Act negligence action, as far as the seaman is concerned, is "one of the reasonable seaman in like circumstances." *Crawford v. Falcon Drilling Co., Inc.*, 131 F.3d 1120, 1125 (5th Cir. 1997) (quoting *Gautreaux,* 107 F.3d at 339).

Finally, the conduct of the deckhand of the *Big Sam* did not matter as far as TECO was concerned. Zito Fleeting and its staff on the *Big Sam* were not employees of TECO. Even though TECO paid them for their services, that, of itself, does not establish an employee–employer relationship. It is just one factor. A much more important factor is control, and the evidence failed to establish that TECO controlled or had the right to control their conduct. The *Eleanor Gordon*'s crew did not give directions to the Big Sam in pulling off CM019B, instead the tug acted autonomously. Thus, Zito Fleeting was an independent contractor, and TECO is not responsible for its conduct or the conduct of the crew on the *Big Sam*. Even if it were, as all the experts in the case agreed, the deckhand was where he was supposed to be when Kohlhaas made his unreasonable toss. So even if TECO were responsible for the conduct of the *Big Sam*'s deckhand, the deckhand's conduct was reasonable . The Court notes the second amended complaint (Doc. 37) under which the case proceeded to trial, did not contain any contention by Kohlhaas that TECO was responsible for the deckhands actions or inactions based on any theory of agency law.

Kohlhaas chose six theories of Jones Act liability with respect to the shoulder incident. As to each theory, he has not proven that any act or omission of TECO constituted negligence or played even a slight role in producing his injury. The credible evidence demonstrates the shoulder incident was caused by Kohlhaas' failure to keep alert and maintain situational awareness. Kohlhaas failed to use reasonable care under the circumstances and was the sole cause of the shoulder incident. The credible evidence in the record does not support any finding of negligence by TECO. The credible evidence is that the facts of the incident are other than as described and claimed by plaintiffs in-court testimony.

Conclusion 3: TECO did not negligently cause the injury of Kohlhaas' right hand.

Regarding the hand incident, Kohlhaas claims he injured his right hand because he was using his left hand (non-dominant) in order to protect his injured right shoulder. The credible evidence establishes Kohlhaas did not ask for medical attention for his right shoulder or indicate that he was unable to perform his job duties as a result of his right shoulder condition. Kohlhaas was not forced to work while injured. In fact, after the shoulder incident and before the hand incident, Kohlhaas worked numerous watches, performing heavy manual labor without difficulty and was able to perform pull-ups. Mate Hopwood observed all this and had no reason to believe Kohlhaas was hurt or that an accident report should have been completed. So there was no reason for TECO to suspect it was requiring Kohlhaas to work while on injured status.  As to the incident itself, the credible evidence demonstrates Kohlhaas did not utilize the proper "open hand" method of tightening the ratchet; alternatively, he was tall enough to use the end of the cheater pipe without coming in to proximity of the coaming. By utilizing an unsafe method, Kohlhaas failed to use reasonable care under the circumstances and this was the sole cause of the hand incident. The credible evidence does not support any finding of negligence on the part of TECO with respect to the hand incident.

<u>Conclusion 4: TECO did not breach its warranty of the seaworthiness of the *Eleanor Gordon* with respect to the circumstances surrounding Kohlhaas' shoulder injury.</u>

Owners of vessels are subject to the implied warranty that the vessel, equipment or appurtenances are reasonably fit for their intended use. *Jordan v. U.S. Lines, Inc.*, 738 F.2d 48 (1st Cir. 1984). The warranty of seaworthiness is independent of negligence, but the mere fact that an accident occurs is insufficient for a finding of unseaworthiness. The ship owner will prevail by submitting rebuttal evidence that a piece of machinery was reasonably fit for its intended use even in an imperfect condition. *Valentine v. St. Louis Ship Bldg. Co.*, 802 F.2d 464 (8th Cir. 1986); *Jordan*, 738 F.2d at 48. The duty is reasonableness, not perfection. The ship owner is not required to provide the latest and best equipment, and there is no warranty against an accident-free ship. *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539 (1960).

The standard of causation in unseaworthiness cases is higher than the standard of slight cause required in Jones Act cases. The plaintiff must prove that an unseaworthy condition proximately caused the injuries that are the subject of the complaint. *McClow v. Warrior & Gulf Navigation Co.*, 842 F.2d 1250 (11th Cir. 1988); *Phillips v. W. Co. of N. Am.*, 953 F.2d 923 (5th Cir. 1992).

The assignment of an adequate number of men to safely perform a task is part of the ship owner's warranty of seaworthiness. *Waldron v. Moore–McCormack Lines, Inc.*, 386 U.S. 724 (1967). However, a ship owner is not liable simply because it requests that a seaman perform heavy lifting. *See Carvalho v. Andrea C*, 880 F.2d 416, 1989 WL 80467 (9th Cir. 1989) (table decision) (holding it neither negligent nor unseaworthy to require a commercial fisherman to carry 100 pound bags of salt); *Rutherford v. Lake Mich. Contractors, Inc.*, 132 F. Supp. 2d 572 (W.D. Mich. 2000) (holding that ordering a deckhand to lift 120 pounds of cable did not constitute unseaworthiness); *Martinez v. Sea–Land Service, Inc.*, 637 F. Supp 503 (D.P.R. 1986).

33

Lifting and tossing a ratchet is a one-man job and Kohlhaas was accustomed to handling ratchets alone. It was not uncommon for him to handle ratchets a hundred times during a six hour watch. Kohlhaas did not ask for assistance in tossing the ratchet. Kohlhaas was an experienced well-trained deckhand who knew how to do his job safely and failed to use that knowledge in the circumstance of his injury. The credible evidence establishes there was no unseaworthy condition that caused the shoulder incident.

Kohlhaas' claims the barge was unseaworthy due to TECO's: failing to adequately man the tow; failing to adequately train Plaintiff for his tasks; failing to inspect, look for and discover the presence of excess equipment or remove it pre-injury, when opportunities existed to do so; failing to follow the "buddy system" for crewmembers at the head of the tow during barge-transfer operations; and the pilot's failure to supervise and monitor the situation from the wheelhouse or direct the fleet tug what to do or to properly supervise the operations of others on the barge. These theories are unavailing. All these allegations have been addressed earlier with the exception of the claims the pilot did not perform as he should have. As to that claim, there was no evidence he was in a position to do anything because his sight line was compromised by the coaming and he was about a thousand feet away from the head of the tow where Kohlhaas was working Moreover, no evidence was presented that he controlled or had the right to direct or control the actions of the tug operator or its employees.

Conclusion 5: TECO did not breach its warranty of the seaworthiness of the *Eleanor Gordon* with respect to the circumstances surrounding Kohlhaas' hand injury.

There was no unseaworthy condition during the ratchet tightening incident either. Tightening a ratchet is a one man job. The ratchet, the cheater pipe and the wires were not defective.. Again, the standard for seaworthiness is that the machinery must be reasonably fit for its intended use, not that the machinery is perfect. *Mitchell*, 362 U.S. 539. In this case, the

ratchets were reasonably fit for their intended use by deckhands. The deckhands that work the ratchets and the rigging know that slack in the rigging can cause a ratchet to lurch forward. This is why they use the open hand method instead of the method that Kohlhaas opted to use on April 16, 2005 and which caused him to injure himself. As far as assigning Kohlhaas to tighten the ratchet after he had the shoulder incident, none of the *Eleanor Gordon*'s officers had any reason to suppose that Kohlhaas was injured and unable to complete the simple task of ratchet tightening. He was an experienced deckhand. He said several times after reporting the popping sensation that he was all right and could continue working. He completed the rest of his watches and his tow work. He even did pull-ups on the awning of the ship. The officers of the *Eleanor Gordon*, and thus TECO, cannot be faulted for assigning an apparently fit experienced deckhand, who was not favoring his shoulder while doing pull-ups, to do tow work. Instead, if any fault can be assigned to the hand incident, it is not the fault of TECO but instead entirely Kohlhaas' own fault in failing to use reasonable care.

Conclusion 6: Kohlhaas' alleged injuries to both his hand and his shoulder occurred while in the service of the *Eleanor Gordon*.

Injured seamen are also entitled to food, lodging and medical services if they are injured while serving the ship. *Atl. Sounding Co. v. Townsend*, 129 S. Ct. 2561, 2565 (2009) (quoting *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 441 (2001)). The food and lodging are known as "maintenance," while medical services are known as "cure." The duty to provide maintenance and cure is incident to the contract employing the seaman, but "it cannot be modified or waived." *Id.* at 2574 n.9 (citing *Cortes v. Balt. Insular Line, Inc.*, 287 U.S. 367, 372 (1932)). To establish a claim for maintenance and cure, the plaintiff need only demonstrate that (1) the plaintiff is a seaman, (2) the plaintiff became ill or injured in the service of the ship and (3) the plaintiff incurred expenditures for medicine, treatment, lodging or food. 1B *Benedict on*

*Admiralty* § 43, at 4-6 (7th ed. rev. 2010). The seaman is entitled to maintenance and cure even if the seaman caused the injury and was the sole cause of that injury as long as the injury was incurred while in the service of the ship, meaning "generally answerable to its call to duty." *Farrell v. United States*, 336 U.S. 511, 516 (1949). However, the question remains if Kohlhaas injured himself while in the service of the ship.

The Court concludes that Kohlhaas experienced both injuries while in the ship's service. The hand incident is the easiest one; there is no evidence to suggest that Kohlhaas did not smash his hand into the coaming on April 16, 2005 while tightening the ratchet under ship's orders. However, there is evidence to suggest that Kohlhaas did not injure his shoulder on April 14 or that the injury suffered on April 14 was not to the full extent that he claims. At worst it did not happen; at best it was an aggravation of a pre-existing condition but not based upon his employers negligence in any event. First, Kohlhaas had told the crewmembers that he injured his right shoulder playing football. Second, Kohlhaas had a history of popping sensations in his right shoulder. Finally, Dr. Smith discovered a Hill–Sachs lesion when examining Kohlhaas, which is evidence of a shoulder dislocation. If Kohlhaas had dislocated his shoulder on April 14, he would not have been able to do pull-ups the next day or that evening or even do any of the tow work he was assigned. Despite this evidence, it is undisputed that Kohlhaas got off the boat on April 25 to get medical treatment for his shoulder and that he experienced a popping sensation after arresting his toss on April 14. Giving Kohlhaas the benefit of the doubt, although he did not dislocate his shoulder, he may have inflicted the Bankart tear and the separation of the anterior labral when he arrested his toss of the ratchet, both of which Dr. Smith repaired later on in Kohlhaas' treatment. The Court recognizes this conclusion may well be inconsistent with plaintiffs ability to perform pull-ups shortly after the incident—but the jump-ball here goes him.

Conclusion 7: TECO's duty to maintain Kohlhaas while injured and to cure Kohlhaas' injury
began on April 14, 2005 and ended on March 6, 2006

Maintenance and cure "does not hold a ship to permanent liability for a pension, neither does it give a lump-sum payment to offset disability based on some conception of expectancy of life." *Farrell*, 336 U.S. at 519. Instead, the duty "extends during the period when [the seaman] is incapacitated to do a seaman's work and continues until he reaches maximum medical recovery." *Vaughan v. Atkinson*, 369 U.S. 527, 531 (1962) (citing *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528 (1938)); *accord Pelotto v. L & N Towing Co.*, 604 F.2d 396, 400 (5th Cir. 1979). "When it appears that a seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." *Cella v. United States*, 998 F.2d 418, 430 (7th Cir. 1993) (citing *Pelotto*, 604 F.2d 396, 400 (5th Cir. 1979)).

Here the evidence establishes that Kohlhaas reached maximum cure on March 6, 2006, which was when Dr. Smith was going to release Kohlhaas to return to work without restriction. That the date is March 2006 is supported by the fact that Kohlhaas voluntarily ceased treatment then and underwent an examination through Dr. Krieghsauser, on his counsels referral, a mere two months later, who after examining him performed no treatment and released Kohlhaas to return to work without restriction. That Kohlhaas sought treatment years later does not support that he had not reached maximum cure but in fact undermines that conclusion. Dr. Brown's surgery in 2008 removed scar tissue but found nothing else to support Kohlhaas' complaints of pain. Thus, at best, Dr. Brown's surgical treatment merely relieved pain and suffering and did not improve Kohlhaas' condition, meaning that Kohlhaas reached maximum cure before he sought treatment from Dr. Brown to relieve pain.

Kohlhaas has argued that he should receive maintenance up to the first day of trial because of his hand injury, but the facts that these physicians have released him for work, that he never required treatment for his hand injury, and that the only credible evidence at trial regarding the extent of his injury undermine any argument that Kohlhaas is not at maximum cure due to his hand.

Conclusion 8: TECO fulfilled its duty to maintain Kohlhaas and provide for his cure while he was injured.

Regarding a plaintiff's recovery for maintenance and cure, the plaintiff is allowed "the reasonable cost of that maintenance and cure" at the time of the trial. *Calmar*, 303 U.S. at 531. Based on this, TECO exceeded its duty to cover Kohlhaas' maintenance and cure.

TECO exceeded its duty to cover Kohlhaas' reasonable medical expenses until he reached maximum cure. The evidence demonstrates that TECO paid $21,364.67 to Kohlhaas for treatment performed between April 25, 2005 to April 12, 2006. TECO only had to cover reasonable medical expenses up to March 6, 2006. Although Kohlhaas was billed $35,995.25 for reasonably necessary medical expenses from April 25, 2005 to March 6, 2006, $15,745.62 of that was covered by the providers themselves. TECO covered the rest.

Not only did TECO exceed its duty to cover Kohlhass's reasonably necessary medical expenses until maximum medical cure, TECO also fulfilled its duty to provide maintenance for the same period. It paid Kohlhaas a total of $12,999 in maintenance, and it only needed to maintain him for the period of April 25, 2005 to March 6, 2006—316 days. The amount paid averages to $41.14 per day in maintenance, which was enough to cover Kohlhaas' daily food and lodging expenses, based on the evidence.

## Disposition

Kohlhaas alleged six theories of negligence under the Jones Act in this case. As to each of those six theories, he has not proven that any act or omission of TECO played even a slight role in producing his injury. Kohlhaas has also not shown that any unseaworthiness of the *Eleanor Gordon* caused his injuries. The credible evidence in the record does not support any finding of negligence by TECO or unseaworthiness of the vessel herein because Kohlhaas' rendition of the facts lack credibility. Finally, based on the medical testimony, Kohlhaas reached maximum cure on March 6, 2006, and TECO met its obligations to maintain Kohlhaas and pay for Kohlhaas' reasonable medical expenses to that point.

Due to the Court's conclusions, Kohlhaas is entitled to no relief from United Barge Line. Accordingly, the Court **DIRECTS** the clerk to enter judgment in favor of U.S. United Barge Line, LLC and against Nathan Kohlhaas.

**IT IS SO ORDERED.**

**DATED August 13, 2010.**

**s/ Michael J. Reagan**
**MICHAEL J. REAGAN**
**United States District Judge**

39